OPINION
{¶ 1} Blaine B. Beery appeals from the judgment of the Lake County Court of Common Pleas, finding him guilty of complicity to robbery. We affirm.
 {¶ 2} October 11, 2005, Mrs. Bhavabahen Patel was working the counter at Mentor Beverage, in Mentor, Ohio. About 11:00 p.m., two masked men entered the store. The taller man wore a white colored mask, the shorter, blue. The men came to *Page 2 
the counter, and demanded money. The shorter man then came around the counter still demanding money, while the taller man demanded she be shot. Mrs. Patel pushed past the shorter man, and grabbed the store phone, which the shorter man took from her and hung up. Mrs. Patel began screaming for her father-in-law, who was at the Dunkin Donuts, next door. The robbers fled to the parking lot, followed by Mrs. Patel.
 {¶ 3} Brian Norris was sitting in his tow truck in the parking lot, drinking coffee and chatting with a driver from a rival company. Mr. Norris saw the two robbers flee Mentor Beverage, pursued by Mrs. Patel. Mr. Norris followed the robbers around the corner of the building, and saw them enter a burgundy and grey/silver Chevy Blazer. Mr. Norris chased the Blazer out onto Mentor Avenue, while calling the Mentor dispatcher to inform them he was in pursuit. He followed the Blazer down Middlesex Road at high speed, while the robbers threw items out the windows. Eventually, the Blazer turned into a cul-de-sac, and the passenger jumped out. Mr. Norris tried to block the road, but the Blazer pulled past him on the grass. Mr. Norris continued chasing the Blazer until it crashed into a telephone pole at the corner of Forest Road and Silver Beech.
 {¶ 4} Alerted, the Mentor police set up a perimeter. Patrolman Sutton responded to the intersection of Forest Road and State Route 84. There, he spotted a man run through a yard, cross State Route 84, then walk along the sidewalk, eastbound. Patrolman Sutton approached the man, and asked to speak with him three times, before the man responded. The man had mud on his hands and arms, and was sweating heavily, which intrigued Patrolman Sutton, as the temperature was in the 50s. The patrolman brought the man back to his cruiser, learned his name was Jack Lederer, *Page 3 
and that there was a warrant outstanding for his arrest. The patrolman placed Mr. Lederer under arrest, and took him to the station.
 {¶ 5} Sergeant Kenneth Willis responded to Deepwood Boulevard. There, he noticed a man, dressed in jeans and a tee shirt walking northbound. Sergeant Willis got out of his cruiser to talk with the man, Mr. Beery, who responded readily. Mr. Beery told the sergeant that he was homeless, had left Great Lakes Mall when it closed, and was looking for a place to sleep in the Deepwood condominiums. The sergeant noticed Mr. Beery's jeans were wet from the knees down, and that he was sweating. Finding this peculiar in the cool evening, Sergeant Willis handcuffed Mr. Beery, and put him in his cruiser, where he gave Mr. Beery a Miranda warning, then asked him for consent to continue questioning. Mr. Beery agreed. When asked if he was involved in the Mentor Beverage incident, Mr. Beery denied any knowledge.
 {¶ 6} Patrolman Richard Gerber, a Mentor police dog handler, responded to the Blazer crash scene with Bronco, one of the department's tactical dogs. Finding no one in the Blazer, Patrolman Gerber brought Bronco to the driver's side door to see if he could pick up a track. The patrolman was aware that suspects were being detained on State Route 84 and Deepwood Boulevard. Bronco did not find a track from the driver's side, but did pick one up on the passenger's side. He led Patrolman Gerber eastbound, to a fence-line, where he lost the track. The patrolman returned Bronco to the point where he last had the scent, and gave him a tracking command. Bronco returned to the fence-line, where he went under, while Patrolman Gerber, joined by Patrolman Paulchel, jumped over. Patrolman Gerber gave Bronco another tracking command, and Bronco continued to track through a large field, with another fence on the other side. *Page 4 
Bronco went under this fence, too, with the patrolmen again jumping over. Bronco tracked northeast through another field, until he reached a road, where he cut left. Bronco continued tracking along the side of the road — until he ended up at the rear passenger door of Sergeant Willis' cruiser, where Mr. Beery was sitting.
 {¶ 7} On the morning of October 12, 2005, Mr. David Karoglan of Mentor reported his Chevy Blazer as stolen. It turned out to be the Blazer used in the robbery. Mr. Karoglan stated that Mr. Beery and Mr. Lederer were his roommates, and that each was supposed to pay him $60 per month in rent. He told police he had obtained the Blazer from someone in Painesville October 9, 2005, and that Mr. Lederer helped him pick it up, since he had no driver's license. Mr. Karoglan stated he brought home crack and beer the evening of October 11, 2005, to share with his roommates. When these ran out, Mr. Karoglan called his drug dealer to obtain more cocaine, while Mr. Beery and Mr. Lederer went to get more beer. As his friends never came home, Mr. Karoglan smoked the crack himself and went to bed.
 {¶ 8} Detectives Collier and Donahue processed the crime scene, and conducted the interviews with Mr. Beery and Mr. Lederer. Detective Collier supervised the collection of evidence thrown from the Blazer during Mr. Norris' chase. Mr. Beery initially denied knowing Mr. Lederer or Mr. Karoglan. He denied having been in any Blazer, recently. DNA taken from beer cans found in the Blazer excluded Mr. Beery as the imbiber. Neither Mrs. Patel nor Mr. Norris could identify Mr. Beery or Mr. Lederer as a suspect, though Mrs. Patel said they were the correct size. Mrs. Patel did state that material recovered by the police from items thrown out of the Blazer was similar to the material of the masks worn by the robbers. None of Mr. Beery's fingerprints were found *Page 5 
either in Mentor Beverage, or in the Blazer. Shoes thrown out of the Blazer were a size 9, while Mr. Beery wears a size 11. Mr. Karoglan stated a white bandana and black shirt with red and white stripes recovered by police looked like items belonging to Mr. Beery. However, the bandana had hair on it, while Mr. Beery is hairless.
 {¶ 9} By an indictment filed November 18, 2005, Mr. Beery was charged with one count of robbery in violation of R.C. 2911.02(A)(2), a second degree felony; one count of robbery in violation of R.C. 2911.02(A)(3), a third degree felony; and two counts of complicity to robbery in violation of R.C. 2923.03(A)(2), second and third degree felonies, respectively. November 23, 2005, he entered a written plea of "not guilty." December 7, 2005, Mr. Beery moved to suppress any evidence obtained as a result of his arrest. December 20, 2005, hearing was held; by an opinion and journal entry filed January 5, 2006, the trial court denied the motion.
 {¶ 10} Jury trial was held March 7 through March 9, 2006. The jury found Mr. Beery guilty of third degree complicity to robbery, acquitting him of the other charges. Sentencing hearing was held April 17, 2006. By a judgment entry filed April 18, 2006, the trial court sentenced Mr. Beery to three years imprisonment. He timely noticed this appeal, making eight assignments of error:
 {¶ 11} "[1.] The trial court erred when it denied the defendant-appellant's motion to suppress in violation of his due process rights guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Section 10, Article I of the Ohio Constitution.
 {¶ 12} "[2.] The trial court erred to the prejudice of the defendant-appellant in denying his motion for acquittal made pursuant to Crim.R. 29(A). *Page 6 
 {¶ 13} "[3.] The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence.
 {¶ 14} "[4.] The trial court erred when it sentenced the defendant-appellant to a more-than-the-minimum prison term in violation of the Due Process and Ex Post Facto clauses of the Ohio and United States Constitutions.
 {¶ 15} "[5.] The trial court erred when it sentenced the defendant-appellant to a more-than-the-minimum prison term in violation of defendant-appellant's right to due process.
 {¶ 16} "[6.] The trial court erred when it sentenced the defendant-appellant to a more-than-the-minimum prison term based on the Ohio Supreme Court's severance of the offending provisions underFoster, which was an act in violation of the principle of separation of powers.
 {¶ 17} "[7.] The trial court erred when it sentenced the defendant-appellant to a more-than-the-minimum prison term contrary to the Rule of Lenity.
 {¶ 18} "[8.] The trial court erred when it sentenced the defendant-appellant to a more-than-the-minimum prison term contrary to the intent of the Ohio legislators."
 {¶ 19} Under his first assignment of error, Mr. Beery argues that Sergeant Willis had neither specific and articulable facts on which to base an investigatory stop, nor probable cause to arrest him. He notes he was fully cooperative with the sergeant when stopped on Deepwood Boulevard, and that it is not surprising for a poor man to be ill-clad for cool, autumn evenings. He notes, too, that walking on the public streets is no crime. He contends he was already under arrest when Bronco allegedly tracked him to the sergeant's cruiser. *Page 7 
 {¶ 20} At a hearing on a motion to suppress, the trial court functions as the trier of fact. Accordingly the trial court is in the best position to weigh the evidence by resolving factual questions and evaluating the credibility of witnesses. State v. Mills (1992),62 Ohio St.3d 357, 366; State v. Smith (1991), 61 Ohio St.3d 284, 288.
 {¶ 21} On review, an appellate court must accept the trial court's findings of fact if they are supported by some competent and credible evidence. State v. Retherford (1994), 93 Ohio App.3d 586, 592. After accepting the factual findings as true, the reviewing court must then independently determine, as a matter of law, whether the applicable legal standard has been met. Id. See, also, State v. Swank (Mar. 22, 2002), 11th Dist. No. 2001-L-054, 2002 App. LEXIS 1345, at 9-10.
 {¶ 22} To justify an investigative stop, the police "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio (1968), 392 U.S. 1, 21. "An inarticulate hunch or suspicion is not enough. The officer must have a reasonable belief and specific facts upon which a reasonable suspicion could be based that [the detainee] was violating or about to violate the law." (Citations omitted.) State v. Dickinson (Mar. 12, 1993), 11th Dist. No. 92-L-086, 1993 Ohio App. LEXIS 1428, at 4. The propriety of an investigative stop must be viewed through the eyes of a reasonable and prudent police officer, under the totality of the circumstances. State v. Andrews
(1991), 57 Ohio St.3d 86, 87-88.
 {¶ 23} "Probable cause for a warrantless arrest exists when the arresting officer has within his knowledge facts and circumstances which amount to reasonable and trustworthy information sufficient to warrant a prudent man in believing that a crime or *Page 8 
offense had been or is being committed and that the person to be arrested is the probable offender." State v. Kobi (1997),122 Ohio App.3d 160, 169, citing Beck v. Ohio (1964), 379 U.S. 89. Again, the totality of the circumstances must be considered when probable cause for a warrantless arrest is analyzed. State v. Brown, 11th Dist. No. 2006-L-040, 2007-Ohio-464, at ¶ 22.
 {¶ 24} When viewed through the prism of these principles, neither Sergeant Willis' stop, nor his arrest, of Mr. Beery was constitutionally offensive; consequently, the trial court correctly denied the motion to suppress. The circumstances are limited in number — but viewed in their totality, provided Sergeant Willis both with specific and articulable facts supporting the stop, and probable cause to arrest. Sergeant Willis spotted Mr. Beery near the scene where the Blazer involved in the robbery had crashed, late at night, shortly following the crash. Nobody else was about. Mr. Beery was dressed inappropriately for the weather, wearing only jeans and a tee shirt on a damp, cool evening. The would-be robbers had thrown items from the Blazer as they fled-including items of apparel. All of this was sufficient to justify the sergeant in stopping Mr. Beery, to question him briefly. Such conduct does not offend theFourth Amendment. Terry at 19, fn. 16.
 {¶ 25} Upon stopping Mr. Beery, Sergeant Willis observed the latter was wet from the knees down, as if from running or crawling through grass and bushes, and perspiring. Combined with the proximity to the time and scene where the Blazer crashed, and the paucity of others in the area, the totality of the circumstances naturally infers that Mr. Beery might have been fleeing the crash scene. This inference was further supported by Mr. Beery's explanation for his presence: that he was looking for a *Page 9 
place to bed down, after leaving Great Lakes Mall. As the trial court wisely observed in denying the motion to suppress, the area where Mr. Beery was stopped is close to the mall, and it would be unreasonable to suppose it took him some two and one-half hours to proceed from the mall (which closed at 9:00 p.m.), to where he was arrested, around 11:30 to 11:45 p.m.
 {¶ 26} In sum, the following all gave Sergeant Willis both specific and articulable facts justifying an investigative stop, and probable cause to arrest: the time (late at night, close to that of the Blazer's crash); the place (close to the Blazer's crash); the lack of others in the area; Mr. Beery's dress (light clothing on a cool, damp night); the condition of his dress (wet, as if running through fields or brush); his condition (perspiring on a cool, damp evening); and, the incredibility of his explanation for his presence.
 {¶ 27} The first assignment of error is without merit.
 {¶ 28} By his second and third assignments of error, Mr. Beery challenges the trial court's denial of his Crim.R. 29(A) motion, and the manifest weight of the evidence used to convict him. A Crim.R. 29(A) motion questions the sufficiency of the evidence, whether the state has introduced evidence on each element of a crime sufficient to prove guilt beyond a reasonable doubt. State v. Patrick, 11th Dist. Nos. 2003-T-0166 and 2003-T-0167, 2004-Ohio-6688, at ¶ 18. A finding of sufficiency being required to submit a case to the jury, determination that the conviction is supported by the weight of the evidence is also dispositive of its sufficiency. State v. Thomas, 9th Dist. Nos. 22990 and 22991,2006-Ohio-4241, at ¶ 6. Consequently, we consider the assignments together. *Page 10 
 {¶ 29} When reviewing a claim that a judgment was against the manifest weight of the evidence, an appellate court must review the entire record, weigh both the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered.State v. Martin (1983), 20 Ohio App.3d 172, 175; see, also, State v.Thompkins (1997), 78 Ohio St.3d 380, 387.
 {¶ 30} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175. The role of the appellate court is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. Thompkins at 390 (Cook, J., concurring). The reviewing court must defer to the factual findings of the trier of fact as to the weight to be given the evidence and the credibility of the witnesses. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 31} When assessing witness credibility, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." State v. Awan (1986),22 Ohio St.3d 120, 123. "Indeed, the factfinder is free to believe all, part, or none of the testimony of each witness appearing before it." Warren v.Simpson (Mar. 17, 2000), 11th Dist. No. 98-T-0183, 2000 Ohio App. LEXIS 1073, at 8. Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict. Id. *Page 11 
 {¶ 32} Mr. Beery points to many frailties in the state's case: the lack of physical evidence; the inability of Mrs. Patel (who knew him as a customer) and Mr. Norris to identify him as one of the robbers; the untrustworthiness of Mr. Karoglan, an admitted drug addict with a record. He notes his bad limp, a characteristic not spotted by either Mrs. Patel or Mr. Norris in either of the robbers.
 {¶ 33} Nevertheless, we cannot find his conviction against the weight of the evidence. The Blazer used in the crime was Mr. Karoglan's; Mr. Beery and Mr. Lederer had access to it; Mr. Karoglan testified the two went out the evening of the crime to get beer. The jury was free to credit this. Cf. Awan at 123. Mr. Beery was stopped in the vicinity where the Blazer crashed, shortly thereafter. And Bronco tracked him from the Blazer, to Sergeant Willis' cruiser. Mr. Beery remarks on the admission of Patrolman Gerber that Bronco briefly lost the track at the one fence. Patrolman Gerber testified he took Bronco back to the point where he lost the track, and Bronco reacquired it. The jury could choose to believe this. Id. Mr. Beery argues Patrolman Gerber was in contact with the other police officers, and infers this allowed Patrolman Gerber to direct Bronco to Sergeant Willis' cruiser. Mr. Beery's counsel was able to cross-examine on this; and the jury was free to believe the patrolman. Simpson at 8.
 {¶ 34} The conviction was not against the manifest weight of the evidence. Consequently, that evidence was sufficient. Thomas at ¶ 6. The second and third assignments of error are without merit.
 {¶ 35} By his fourth through eighth assignments of error, Mr. Beery challenges his more-than-minimum sentence. The assignments track those made in a case recently considered by this court, State v. Elswick, 11th Dist. No. 2006-L-075, 2006-Ohio-7011, *Page 12 
at ¶ 5-9, in which appellant challenged his more-than-minimum sentences. We believe our analysis in Elswick concerning more-than-minimum sentence challenges under State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856 and its progeny is fully applicable herein.
 {¶ 36} The fourth and fifth assignments of error are interrelated: each is premised on alleged violations of ex post facto principles embedded in the principle of due process. By the fifth assignment of error, Mr. Beery contends the trial court violated Due Process and the Ex Post Facto Clauses of the Ohio and United States Constitutions by sentencing him to a more-than-minimum term of imprisonment. Mr. Beery contends this sanction was not available to the trial court at the time he committed his offense. By the second assignment of error, Mr. Beery contends he had neither actual nor constructive notice that a more-than-minimum sentence might be imposed for his conduct. He further argues that the trial court could not constitutionally impose a more-than-minimum sentence without additional factual findings by a jury, or based on his admission.
 {¶ 37} In Elswick, we determined Foster did not contravene the federal constitutional guarantee of due process, and prohibition against ex post facto laws, since it did not affect a defendant's right to a sentencing hearing; did not alter the statutory range of sentences available to trial courts for any particular degree of crime; and, because the potential for a judicial declaration that certain portions of Ohio's sentencing statutes were unconstitutional was prefigured by the decisions of the United States Supreme Court in Apprendi v. NewJersey (2000), 530 U.S. 466; and, Blakely v. Washington (2004),542 U.S. 296. Elswick at ¶ 21-25. As applied to this case, Mr. Beery *Page 13 
knew that a more-than-minimum sentence could be imposed by the trial court, both under the pre-and post-Foster sentencing schemes; he knew that the statutory scheme was subject to judicial scrutiny; and, there is nothing to indicate his criminal conduct would have been affected by the sentencing change. See, e.g., Elswick at ¶ 25. Consequently,Foster neither implicates Mr. Beery's federal due process rights, nor the federal prohibition against ex post facto laws. Id.
 {¶ 38} In Elswick, relying on the analysis by the court in State v.McGhee, 3d Dist. No. 17-06-05, 2006-Ohio-5162, we determined thatFoster did not violate the Ohio constitutional guarantee of due process, and prohibition against ex post facto laws, since it is not substantively retroactive. Elswick at ¶ 28-30. This is becauseFoster does not impair any vested right, or any accrued substantive right of a criminal defendant, since there is no such right in a presumed sentence. Elswick at ¶ 29.
 {¶ 39} Finally, we note that the argument that more-than-minimum sentences may only be imposed based on additional jury findings or admission of the defendant is meaningless in the post-Foster landscape.Foster specifically grants trial courts discretion to sentence within the applicable statutory range. Id., at paragraph seven of the syllabus. By way of illustration, in this case, Mr. Beery was convicted of complicity to robbery, a third degree felony. Under Foster, this was a sufficient admission by the defendant to allow the trial court to sentence him to any period authorized by statute-which it did.
 {¶ 40} Based on our decision in Elswick, the fourth and fifth assignments of error are without merit. *Page 14 
 {¶ 41} By his sixth assignment of error, Mr. Beery alleges that the remedy applied by the Ohio Supreme Court in Foster, of severing the constitutionally offensive provisions of the sentencing statutes, violates the doctrine of the separation of powers. Again, our reasoning in Elswick is dispositive: R.C. 1.50 specifically provides for the severance by the Ohio judiciary of constitutionally unsound portions of statutes; and, this same remedy was applied by the United States Supreme Court to the federal sentencing guidelines, in United States v.Booker (2005), 543 U.S. 220. Elswick at ¶ 37-38. Further, we note that the inferior tribunals of this state are strictly bound by the constitutional mandates and statutory constructions made by the Ohio Supreme Court. State ex rel. Ohio Academy of Trial Lawyers v.Sheward (1999), 86 Ohio St.3d 451, 475 (constitutional mandates);State v. Sides, 11th Dist. No. 2005-L-175, 2006-Ohio-2778, at ¶ 13
(statutory constructions). Neither the trial court, nor this court, can alter the remedies prescribed by the Supreme Court in curing a constitutionally-infirm statute.
 {¶ 42} The sixth assignment of error is without merit.
 {¶ 43} By his seventh assignment of error, Mr. Beery alleges that the trial court's application of Foster to him, resulting in a more-than-minimum sentence, violates the "rule of lenity." The rule of lenity, codified at R.C. 2901.04(A), provides, in pertinent part: "* * * sections of the Revised Code defining offenses or penalties shall be strictly construed against the state, and liberally construed in favor of the accused." The rule of lenity applies only to ambiguities in criminal statutes concerning conduct which is clearly proscribed.Elswick at ¶ 42.
 {¶ 44} Mr. Beery was sentenced by the trial court following the announcement of Foster. Consequently, "* * * the trial court was bound to apply the law announced by the *Page 15 
Supreme Court of Ohio [in Foster]." Elswick at ¶ 43. InElswick, we determined that there is nothing ambiguous about R.C.2929.14(B). Elswick at ¶ 43. The rule of lenity does not apply. Id.
 {¶ 45} The seventh assignment of error is without merit.
 {¶ 46} By his eighth assignment of error, Mr. Beery alleges that the trial court's application of Foster to his sentencing was contrary to the intent of the legislators of this state in creating Ohio's statutory sentencing structure. He contends that the overriding intent of the General Assembly in enacting that structure was to create uniformity and proportionality in sentencing; while the effect of Foster is to place unfettered discretion in the hands of our trial courts. Cf. Id., at paragraph seven of the syllabus. Mr. Beery further contends thatFoster renders meaningful appellate review of sentences impossible.
 {¶ 47} Elswick contains an extensive discussion of these issues, fully applicable to this case. Id. at ¶ 45-54. All we would add is that this court is without power to review the Ohio Supreme Court's decisions regarding legislative intent. Cf. Sheward at 475; Sides at ¶ 13.
 {¶ 48} The eighth assignment of error is without merit.
 {¶ 49} The judgment of the Lake County Court of Common Pleas is affirmed.
 WILLIAM M. O'NEILL, J., MARY JANE TRAPP, J., concur. *Page 1